**TSS SPORTSWEAR, LIMITED, formerly Regency Creations, Limited, a corporation, Appellant,**

v.

**The SWANK SHOP (GUAM) INC., a corporation, Appellee.**

**No. 21009.**

United States Court of Appeals Ninth Circuit.

June 28, 1967.

David M. Shapiro, Agana, Guam, for appellant.

E. R. Crain, Richard H. Benson, Agana, Guam, for appellee.

Before BROWNING and DUNIWAY, Circuit Judges, and TAVARES, District Judge.

TAVARES, District Judge.

This action was brought by plaintiff, TSS Sportswear, Limited (hereinafter

sometimes called Sportswear), formerly Regency Creations, Limited (hereinafter called Regency Creations), a Hong Kong corporation, against the defendant, The Swank Shop (Guam), Inc., a Guam corporation (hereinafter called Swank (Guam)). Inasmuch as practically all of the significant events involved herein occurred while plaintiff was known as Regency Creations, Limited, we will generally use the name Regency Creations to refer to plaintiff under either name.

From a judgment for the defendant after a non-jury trial, dismissing the action with costs to defendant, the plaintiff has appealed to this Court. Jurisdiction of the District Court of Guam is based on 48 U.S.C. Sec. 1424. Jurisdiction of this Court over this appeal is based on 28 U.S.C. Secs. 1291 and 1294.

By the original complaint filed on July 1, 1965, plaintiff claimed of defendant, in Count I, $13,912.20 as an alleged balance due it from the defendant by book account between January 31, 1962 and January 17, 1964; in Count II, $2,487.54 as an alleged balance due from defendant to The Swank Shop, Limited, Hong Kong, a Hong Kong Corporation (hereinafter

Swank (Hong Kong)) on book account between June 15, 1960 and February 4, 1963, and assigned by Swank (Hong Kong) to plaintiff; and in Count III $9,640.12 as an alleged balance due from defendant to Regency Manufacturing Company, Ltd., a Hong Kong corporation (hereinafter Regency Manufacturing), on book account between July 31, 1961 and June 25, 1965, and assigned by Regency Manufacturing to plaintiff. The total thus sued for was $26,039.86.

After certain extensions [1] of time to plead granted ex parte to defendant by the Court, and before Answer was filed, the plaintiff noticed several depositions to be taken in Hong Kong, including the deposition of David Weire (hereinafter called Weire). Defendant moved to quash the taking of such depositions and to stay further proceedings until the alleged "real plaintiff in interest," Weire, a resident of Hong Kong, should be available within the jurisdiction to be examined by defendant, and for other relief. Thereafter, it was stipulated by counsel for plaintiff, Mr. David M. Shapiro, and counsel for defendant, Mr. E. R. Crain, that such depositions might be

1. These ex parte extensions and other actions of the Court preceding the trial, including the Court's order that Mr. Weire be present at the trial for cross-examination in court by defendant, and the Court's pre-trial announced intention to take into consideration facts and evidence produced at a then recently completed trial of an action between the same parties before the same judge, and the Court's adoption of a pre-trial order containing statements objected to by plaintiff, are cited by plaintiff as alleged examples of bias and prejudice on the part of the trial judge. However, although some of these rulings seem unnecessarily peremptory, and severe, they were matters within the sound discretion of the trial judge, or they were not, in the light of the entire record, so prejudicial on the merits as to warrant a reversal based thereon, especially since (a) the plaintiff did not seasonably or at any time raise the question of disqualification of the trial judge for alleged bias and prejudice, which in effect it now appears to urge, and (b) we do not find that, on the record as a whole,

and for reasons hereinafter stated, the plaintiff, even on a new trial with the admission of all the evidence he claims to have been erroneously excluded, would be entitled to prevail on the merits. As it happens, all excluded depositions and exhibits marked for identification but not admitted, are included in the record on this appeal, and the Court has carefully examined them all. The only evidence excluded over plaintiff's objections was the testimony of several witnesses, e. g., certain questions asked by plaintiff's counsel of defendant's bookkeeper, Miss Karmee Dolly, of Mrs. Karlins, and of Weire, and excluded by the lower court. Although the conclusion reached by this Court would be the same without the excluded evidence, this Court has actually taken the precaution of reading all of the available excluded evidence, and has also taken into consideration the most unfavorable (to defendant) answers which could reasonably have been anticipated had plaintiff been permitted to have answered the questions of witness by plaintiff which were excluded or not permitted to be asked or answered.

taken before the U. S. Consul in Hong Kong, with Mr. Weire's being taken first. Defendant's time for filing answer meanwhile was continued until after the taking of the depositions.

On November 5, 1965, while attorneys Shapiro and Crain, representing the plaintiff and defendant respectively, were on an airplane enroute to Hong Kong for the taking of the depositions, the former served upon the latter an amended complaint.

By the amended complaint, in 6 Counts, the plaintiff claimed:

(a) By Count I,[2] $2,999.35, based on a Bill of Exchange dated December 10, 1962, drawn by plaintiff (then Regency Creations) upon defendant, requiring defendant to pay to a bank (hereinafter for convenience called the Belgian Bank) at Hong Kong, $2,880.56, accepted by the defendant January 8, 1963, and subsequently dishonored and paid by plaintiff (as Regency Creations).

(b) By Count II,[2] plaintiff claimed $5,439.27 had upon a Bill of Exchange dated December 13, 1962, drawn by plaintiff (then Regency Creations) upon defendant and requesting defendant to pay to the Belgian Bank $5,439.27, accepted by plaintiff January 8, 1963, and subsequently dishonored and paid by plaintiff (as Regency Creations).

(c) By Count III,[2] plaintiff claimed $2,013.13, based upon Bill of Exchange drawn by plaintiff (Regency Creations) upon defendant, requesting defendant to pay to Belgian Bank $1,985.37, accepted by plaintiff on March 27, 1963, and subsequently dishonored and paid by plaintiff (as Regency Creations).

(d) By Count IV, plaintiff made the same claim for $13,912.29 as in Count I of the original complaint, based on an alleged book account between Swank (Hong Kong) and defendant, and assigned to plaintiff.

(e) By Count V,[3] plaintiff made the same claim for $2,487.54 as in Count II of the original complaint, based on an alleged book account between Swank (Hong Kong) and the defendant, and assigned to plaintiff.

(f) By Count VI, plaintiff claimed $5,179.25 allegedly due from defendant to Regency Manufacturing on book account between July 31, 1961 and June 25, 1963, and assigned to plaintiff by Regency Manufacturing.

It will be seen from the amended complaint that each of the items claimed in the amended complaint was allegedly owed prior to August 28, 1963, the date of the sale of stock of defendant Swank (Guam) from Weire to Mrs. Karlins, as hereinafter explained.

The grand total of amounts claimed under Counts I to VI of the amended complaint was $32,285.29. However, the abandonment of Count V for $2,487.54 by plaintiff left a total balance claimed of $29,797.75.

Following the depositions taken by plaintiff in Hong Kong, defendant filed a pleading entitled "Answer, Counterclaim and Cross Complaint or Cross Claim"—in reality a counterclaim under Rule 13(a) and (h), and 14, F.R.Civ.P.—in which, (a) defendant (as we understand his said pleading) in substance denied liability under each Count of the amended complaint; (b) defendant in its counterclaim alleged that plaintiff Sportswear (previously known as Regency Creations) and its assignor, Regency Manufacturing, at all times mentioned in the amended complaint were solely owned by Weire; that said corporations were mere "fictional creatures" of Weire and the "alter-ego" of Weire; that Swank (Guam), the defendant up to the time of its sale in September 1963 to Margarette Karlins and Elliot Karlins, was solely owned by Weire and was "operated individually and solely by Weire" as a corporate fiction in

---

2. Note: Counts I, II and III of the amended complaint, according to defendant's counsel, simply segregated, elaborated upon, and corrected the total claim made in Count III of the original complaint.

3. This Count was abandoned by plaintiff before trial.

conjunction with the other above-named corporations; that by a contract entered into about September, 1963, Weire sold all of his right, title and interest in defendant Swank (Guam) to Margarette and Elliot Karlins for $22,000.00, it being explained that Margarette Karlins was at the time of filing said Answer, etc., sole [4] owner of Swank (Guam) and divorced [4] from Elliot Karlins; that Weire fraudulently concealed from the Karlins the fact that he intended to make demands upon the defendant for large sums of money as a result of his alleged intercompany transfers of merchandise and funds between his alter-egos, Sportswear (previously Regency Creations) and Regency Manufacturing, and Swank (Guam); that on the date of sale of The Swank (Guam) by Weire to the Karlins, no obligations were owned by Swank (Guam) to Weire or "any of his alter-egos"; that Weire sold Swank (Guam) free and clear of all indebtedness except certain current indebtedness recognized by both parties, which indebtedness was promptly paid by defendant after said sale; that at the time of such sale Weire secretly intended to make excessive, onerous and impossible demands over and above the stipulated purchase price, and caused the books of the various alter-ego corporations to be changed to purport to reflect such demands, which did not exist at the time of sale; and that by reason thereof the contract of sale of Swank (Guam) should be rescinded [5] and the parties restored to their original position prior to sale:

That Weire, as the alter-ego of Sportswear, owed Margarette Karlins in commissions $1,045.00.

The Answer and Cross Complaint concluded with a prayer that:

(1) The plaintiff take nothing by its amended complaint;

(2) That Margarette Karlins be joined as "a necessary party plaintiff"; [6]

(3) That Weire be joined as "a necessary party defendant"; [6]

(4) That Margarette Karlins have judgment against Weire and plaintiff corporation for $1,045.00; [6]

(5) That the Contract of Sale of Swank (Guam) be rescinded; [7]

(6) That defendant and Margarette Karlins [6] have their costs.

A Pre-trial Order [8] was entered by the Court, evidently drawn by the Court according to its own notions as to what each party's position was or should be, based both upon matters brought out during the pre-trial conferences, and upon the Court's recollection of facts brought out in evidence on the then recently completed trial of a related claim involving the same parties,[9] which the Court apparently anticipated would be brought out in this case, and which the Court frankly intimated would reflect unfavorably upon the position of plaintiff by tending to support defendant's claim that Weire was the "alter-ego" of the various corporations hereinabove named, or vice versa. Portions of the testimony of various witnesses, including Weire and Mrs. Karlins, in the course of that previous trial were also referred to and used during the trial of the instant case for purposes of proof or impeachment by both parties.

From the lower Court's decision and findings of fact and conclusions of law,

---

4. For these reasons we will generally refer herein to Mrs. Karlins as though she were the sole purchaser of The Swank (Guam).

5. The record as a whole indicates that neither the plaintiff nor the defendant nor the Court took the issue of rescission seriously during the trial and we find that it was abandoned by defendant.

6. See Note 8 infra.

7. See Note 5 supra.

8. From the Pre-trial Order, and the record as a whole, it seems obvious that, contrary to the prayer of the defendant's cross-complaint, neither Weire nor Mr. or Mrs. Karlins was made a party to this action. This automatically eliminated Mrs. Karlins' counterclaim for $1,045.00. See also Note 5 supra, re abandonment of rescission issue.

9. See Note 1, supra.

based upon evidence fully adequate to justify the same, and from the record, the facts are substantially as follows:

In the period January 3, to August 1963, and up to the time of sale, Swank (Guam) was bankrupt in the sense that its liabilities, exclusive of capital stock, exceeded its assets by the ratio of $28,244 to $22,175. A balance sheet in evidence, furnished by plaintiff, showed that as of January 31, 1962, Swank (Guam) had an accumulated loss in operations of $23,123.32, to which was added for February 1962 to January 31, 1963, an additional loss of $6,960.74, or an accumulated loss as of January 31, 1963, of $30,584, and this in spite of substantial reductions effected during the year preceding January 31, 1963.

It was therefore evident that Swank (Guam), as stated by the Court, "in the absence of changes in management or capitalization, was a losing proposition and as of January 31 [1963] its stock was worthless."

Mrs. Margarette Karlins had been employed as manager since 1961 of Swank (Guam). At all times until the sale of the stock of Swank (Guam) to Mr. and Mrs. Karlins (hereinafter mentioned) Mr. Weire, personally or through one of his wholly-owned corporations (Regency Creations), owned or controlled [10] all of the capital stock of Swank (Guam).

Up to the date of sale of Swank (Guam) to the Karlins, Weire owned all of the 1,000 shares which had originally been issued by it, except one qualifying share held by a second director, a friend of Weire, who never took any part in the operation of Swank (Guam).

From some time prior to and until April, 1963, an additional number of shares was issued (apparently between 1800 and 2500 shares)—the total number not being entirely clear, but it being reasonably inferable from the evidence that Regency Creations, in payment of debts allegedly owed by Swank

(Guam) to Regency Manufacturing or other Weire-owned or controlled Hong Kong corporations, had accepted stock "script" in the amount of $25,000 in Swank (Guam)—which this Court understands to mean the equivalent of 2,500 fully paid-up additional shares.

The evidence shows that through some sort of corporate manipulations by Weire, this $25,000 worth of stock script was returned by Weire by letter of April 8, to Mr. Weire's Guam attorney, who evidently exercised control as Weire's agent over the stock records of Swank (Guam), with instructions apparently to cancel same and, in lieu thereof, issue to Weire personally, as of the earlier date of January 28, 1963, $18,000 worth, or 1800 additional shares of stock in Swank (Guam) in alleged payment of $18,000 worth of indebtedness allegedly owed by Swank (Guam) to Regency Creations, apparently resurrecting the original indebtedness of $25,000 supposedly "paid" by the issuance to Regency Creations of the said $25,000 of stock "script," and transferring it or $18,000 of it, from Regency Creations to Weire personally in this strange manner.

■ This type of manipulation between Weire personally and his several wholly-owned or controlled corporations, Swank (Guam) and Regency Creations, and Swank (Hong Kong) shown by Weire's own testimony, plus other evidence in the case, including admissions of Weire that the sole other director in Swank (Guam) apparently never performed any services as director at any time, and that as to Regency Creations the sole other director, Mr. Weire's brother, likewise never took any action as such director, and in fact never lived in Hong Kong, clearly proves that Weire never bothered to go through the regular corporate processes to carry out his wishes, but simply acted as if they were all individual (non-corporate) business entities. This supports the defendant's contentions, and the lower Court's find-

---

10. Except 1 qualifying share required by Guam law to be held by a director, and which was nominally held by a friend of Weire who never took any action as such director.

ings, that these corporations were mere corporate facades manipulated by Weire as his "alter-egos" rather than as bona fide corporations.

In this connection also it should be noted that an additional Hong Kong corporation was involved in the various activities of Weire in relation to Swank (Guam); this was the Swank Shop (Hong Kong), Ltd. (herein called Swank (Hong Kong)), and it likewise was a corporation wholly owned by Weire except for a qualifying share of another director, and Mr. Weire manipulated at will this corporation in the same informal and arbitrary manner as the others mentioned.

With reference to the "alter-ego" theory (claimed by the defendant and found by the lower Court to be well taken) one fact which is relied upon principally by plaintiff as supposedly rebutting such "alter-ego" theory, is that both Weire's testimony and the excluded depositions constitute proof that Regency Manufacturing at all times material to this case was a corporation whose stock and management or operation were *not* controlled by Weire. The evidence shows that Weire in the beginning owned ⅓ of all the issued capital stock of Regency Manufacturing, the other ⅔ being owned equally by a Miss Lau and her brother, Mr. Lau; that some time before the sale of stock by Weire to the Karlins in August or September, 1963, Mr. Lau had sold his stock to Weire and Miss Lau, so that Weire actually owned at least ½ of such stock at the time of the sale of Swank (Guam); but that shortly after the sale of Swank (Guam) to the Karlins, the Belgian Bank in Hong Kong had insisted that a controlling number of shares of Regency Manufacturing be *pledged* with the Belgian Bank to secure Regency Manufacturing's indebtedness or operations.

However, the record shows clearly that, whatever the stock ownership situation might have been, and although apparently Miss Lau was at all times the ostensible managing director of Regency Manufacturing, Weire was able at will to manipulate Regency Manufacturing to do anything he pleased. Illustrations of this are his own admissions that, through bookkeeping entries or the issuance of checks or the issuance of stock or the transfer of merchandise or assets, by or between one or more of his controlled corporations and himself, and/or between them and Regency Manufacturing, Weire was able to, so to speak, "rob Peter to pay Paul," causing debts ostensibly owed Regency Manufacturing by his various controlled corporations to be paid off, and various debts or stocks to be transferred to him, Weire, or one of such Weire corporations, whenever he pleased. These manipulations give more than substantial support to the lower Court's finding that even Regency Manufacturing was sufficiently subject to his control to be held an "alter-ego" of Weire and to justify piercing the corporate veil and binding Regency Manufacturing by the acts of Weire.

Further, it appears that Weire was a director of Regency Manufacturing until as late as September, 1963, *after* the sale of Swank (Guam) stock to the Karlins, so that, *at the time of such sale he could be reasonably inferred to be in a position as a director of Regency Manufacturing, to speak for that corporation.* At the very least, that relationship was sufficient to constitute *notice* to Regency Manufacturing *of the representations and inducements* made and offered by Weire to Mrs. Karlins upon which, as the lower Court held, she relied in purchasing Swank (Guam).

Apparently Weire ceased to be a director of Regency Manufacturing in September, 1963,—conveniently right after the Swank (Guam) sale—and it seems reasonable to infer that that was about the same time at which he claims to have been forced by the Belgian Bank to cause to be transferred to the Belgian Bank, as collateral, a majority of the stock of Regency Manufacturing. This, if true, would not necessarily preclude Weire and Miss Lau (over whom he apparently had great influence) from operating and voting the stock of Regency

Manufacturing, there being no clear evidence to the contrary.

A further illustration of Weire's ability to manipulate at will his various wholly-owned or substantially controlled corporations, is the manner in which, as above-mentioned, he caused the 1800 additional shares in Swank (Guam) to be issued retroactively to him *in April*,[11] 1963, but *as of January 28*, 1963, so that the additional 1800 shares could appear in a balance sheet prepared at his instance, apparently back-dated to January 31, 1963, to make a better showing of the financial condition of Swank (Guam).

In the face of all of these and other manipulations, and other similar machinations, shown by the evidence, we cannot say that the lower Court was in error in holding that all of the above named Hong Kong corporations, as well as Swank (Guam), were the "alter-egos" of Weire through his ownership or control or management of these various corporations.

Coming now to the circumstances attending actual sale of the stock of Swank (Guam), the record indicates, and the Court found, that some time around and prior to August 21, 1963, Weire as seller negotiated with Mrs. Karlins (as he had negotiated with a number of others) trying desperately to sell the Swank (Guam) business or corporation in order to bolster up his financial situation with his other corporations. It appears that as early as June,[12] 1963, Weire had offered to sell control of the corporation to Mrs. Karlins on the following terms:

(a) Mrs. Karlins to invest $10,000 in the business and receive $15,000 in shares of Swank (Guam), thus giving her 1500 shares against Weire's remaining 1300 out of 2800 (exclusive of the 1 qualifying director's share, and inclusive of the 1800 shares ostensibly shown to have been issued as of January 28, to Weire, as above described), or

(b) She to pay in $15,000, and he to sell her 2,250 such shares, retaining 550 out of the 2800 issued shares, and he then to take out an additional 1,000 shares, or $10,000 as part payment of $17,000 in D/A's (drafts accepted) which had been drawn on Swank (Guam) previously and dishonored and paid by one or more of Wiere's "alter-ego" corporations, presumably Regency Creations.

In this letter (Exhibit 5) Weire states that he had just had to retire over $7,000 in D/A's which were past due and apparently had been accepted by Swank (Guam) and dishonored, together with $17,000 of other earlier dishonored D/A's which he had previously paid. In this letter (Exhibit 5)—further illustrating the looseness with which Weire manipulated his various corporations—Weire uses the first person to refer to what, in this case, he now claims to be one or the other of his corporations, and he refers to the various amounts of dishonored D/A's as if he *personally* had paid the entire $17,000 plus $7,000, or $24,000, a total figure remarkably close to the $25,000 stock "script" earlier issued by Swank (Guam) to Regency Creations. The state of the record is such that the Court would be justified in inferring that this $25,000 of stock script was issued to Regency Creations, by Swank (Guam) in payment of said D/A's. That letter (Exhibit 5) also infers that the above-mentioned total payments of $24,000 of D/A's leaves only approximately $2,000 of current D/A's owing by Swank (Guam) to Regency Manufacturing, plus "a small amount due to Regency Creations for Special Order suits sent to you."

By his manipulations of April, 1963, Weire appears (a) to have purportedly resurrected this paid amount of Swank (Guam) debts (paid through issuance of such stock script) nunc pro tunc as of January 28, 1963, by having the $25,000 script returned in April, 1963 to his agent in Guam (keeper of Swank

11. Exhibit "B", although marked only as an exhibit for identification *on Exhibit B*, is shown through transcript (p. 144) to have been *admitted in evidence as Exhibit B*.

12. Letter of June 18, 1963, Exhibit 5.

(Guam's) stock records), and (b) paid again by the issuance to him by Swank (Guam) of 1800 shares, or $18,000 worth, of stock, leaving a retroactively resurrected balance of $7,000 purportedly owing as of January 28, 1963, from Swank (Guam) to Regency Creations. In his letter of June 18, 1963 (Exhibit 5) Weire appears to confirm that said $17,000 of D/A's, and an additional $7,-000 of D/A's had been paid, leaving a balance of about $5,000. Weire's April 8th letter to Mr. Arriola (Exhibit B) probably explains what had actually taken place prior to June 18, 1963. The balance of $5,000 was the amount paid off under the sale agreement.

The evidence is undisputed that during a visit to Guam in July, 1963, Weire offered to sell to Mrs. Karlins for $28-000 all of the shares of stock of Swank (Guam), leaving Swank (Guam) free and clear of any indebtedness, excepting that Weire was to retain the right to any tax refunds. This proposition was turned down by Mrs. Karlins. Thereafter, according to the testimony of Mrs. Karlins, Weire submitted a new offer substantially that she pay $22,000 to him, $15,000 in cash, and the balance in installments of $400 per month with interest at 9%, Mrs. Karlins to pay any taxes owing and receive any refunds and to pay current indebtedness admitted to amount to about $5,000, which the evidence indicates she did pay.

■■ This bargain was handled by oral conferences between Mrs. Karlins and Mr. Weire. The parties having agreed on these terms, the undisputed evidence is that they went to the law office of Mr. Arriola and in the absence of Mr. Arriola, spoke to his partner, Mr. Gayle, and apparently Mr. Weire did most of the talking, according to Mrs. Karlins, whose testimony was believed by the lower Court. The rough memorandum with figures on it, Defendant's Exhibit A, together with the testimony of Mrs. Karlins and Mr. Gayle, indicates, and the lower Court found, that notwithstanding her management of Swank (Guam), Mrs. Karlins was a very naive and inexperienced person in the matter of such transfers and accepted and executed, apparently unquestioningly, the redraft of the contract returned by Weire. Since this final draft as signed (Exhibit 1) says nothing about debts of the Guam corporation being considered paid, other than the current obligations of $5,000 to which Mrs. Karlins testified, plaintiff contends that the parol evidence rule prevents any other evidence being introduced to allegedly modify or change the terms of that written agreement. We disagree.

The testimony of Mrs. Karlins, which obviously was believed by the lower Court—and which we believe was properly so accepted, rather than any contradictory statements of Weire—is that it was orally agreed between her and Mr. Weire as a part of the entire transaction that the debts of Swank (Guam) were paid or were considered paid except for the small current indebtedness of approximately $5,000, and that the stock was sold on this understanding and representation by Weire. As the lower Court indicated in its decision, the very unconscionableness of a transaction whereby Weire would sell the stock of an insolvent corporation for $22,000 plus $5,000 in current liabilities, leaving the purchasers with an alleged additional debt exceeding the total purchase price (the amended complaint claiming some $29,000 to $32,000) compels acceptance of Mrs. Karlins' version of the transaction agreed upon.

In support of its position plaintiff cites "20 Am.Jur. 958, 962, 963, Section 1099." However, as shown by Wigmore, and recognized by the Civil Code of Guam, the parol evidence rule does not apply in this case if Mrs. Karlins' testimony is believed.

Section 1625 of the Civil Code of Guam provides:

"The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."

However, Section 1639 provides:

"When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible; subject, however, to the other provisions of this title."

And the other provisions of this title include Section 1640, which provides that:

"When, through fraud, mistake, or accident, a written contract fails to express the real intention of the parties, such intention is to be regarded, and the erroneous parts of the writing disregarded."

This is in line with what Wigmore says, namely:

"The most usual controversy arises in cases of *partial integration*, i. e. where a certain part of a transaction has been embodied in a single writing, but another part has been left in some other form. Here, obviously the rule against disputing the terms of the document will be applicable to *so much of the transaction as is so embodied, but not to the remainder.*" IX Wigmore Evidence, Third Edition, Section 2430, p. 97, and text preceding and following the above citation.

It is clearly inferable from the record in this case that there was such an omission due to Weire's giving incomplete and inadequate instructions to Mr. Gayle (a member of the law firm which was regularly retained by him on Guam) for the drafting of the final document.[13] Weire's omission of the portion of the bargain he and the Karlins had agreed upon to the effect that the debts of the Guam corporation were paid or were to be considered as paid—an omission the significance of which Mrs. Karlins apparently failed to detect, or which she may have reasonably considered unimportant because of Weire's representations and her own understanding that (as above stated) these debts had been considered by Weire as paid—removed it from the purview of the parol evidence rule.

Accordingly, the parol evidence rule does not apply to that portion of the transaction whereby it was agreed and understood between the parties that the sale of stock was made on the understanding and condition that all debts of the Guam corporation had been or were considered to be paid, except the $5,000 current obligations, which Mrs. Karlins thereafter paid.

Thus there is no inconsistency between the portion of the transaction agreed upon and the portion placed in writing as to the sale of the stock. Neither contradicts the other, and evidence of the oral portion of the contract is admissible because no part of that portion of the transaction was put in writing, through the intentional omission thereof by Weire in his instructions to the law firm which, in that connection (and without any reflection on its honesty), represented both parties but had taken no part in and had no knowledge of the final negotiations for the sale.

The defendant's theory of the case is supported in numerous ways, both by the Civil Code of Guam, and by the record in this case.

Thus, Section 1636 of the Civil Code of Guam states:

"A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."

And Section 1622 states:

"All contracts may be oral, except such as are specifically required by statute to be in writing."

And even where a contract is required by law to be in writing, but

" * * * is prevented from being put into writing by the fraud of a party thereto, any other party who is by such fraud led to believe that it is in writing, and acts upon such belief, to his

---

13. It is only fair to add that the same law firm regularly was consulted by the Karlins also, but primarily apparently in connection with Swank (Guam) business.

prejudice, may enforce it against the fraudulent party." Section 1623.

Section 1642 provides:

"Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together."

Section 1643 provides:

"A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties."

And Section 1647 provides:

"A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates."

Section 1649 provides:

"If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it."

Among other things supporting Mrs. Karlins' version, besides the obviously serious impeachment of Weire in the course of his testimony, is the innate unconscionableness of the transaction, if it was in fact what Weire contends it to be.

Among these is defendant's Exhibit A, which Mrs. Karlins testified was used by Weire in connection with persuading her to purchase the assets and stock of Swank (Guam) for $22,000 plus the liability to pay taxes and current obligations, after she had turned down an offer to purchase the business free of all obligations, for $28,000. This document (Exhibit A) has the appearance of being one of the "scraps of paper" admitted by Weire to have been scribbled upon during the negotiations, and the figures approximately support Mrs. Karlins' version of the figures and contract terms agreed upon. To be sure, the plaintiff adduced the testimony of a so-called "exper witness" tending to show it was not

Weire's handwriting but that of another person named Williams who was not on Guam on the date of the negotiations, but who had corresponded and negotiated with the parties at previous times when he was in charge of the Bank of Hawaii branch on Guam, tending to prove that Mrs. Karlins' testimony that Weire had jotted down these figures in her presence during the final negotiations was not true. And it is also true, as complained by plaintiff's counsel, that Mrs. Karlins after having been examined and cross-examined as to whether the handwriting was Mr. Weire's, and having stated positively that, according to her recollection, it was, and that Mr. Weire had used it in connection with the negotiations, was not allowed to be recalled by plaintiff as an adverse witness and cross-examined further on this document after the subsequent impeaching testimony of the handwriting expert.

■ This refusal on the part of the lower Court was error, but harmless error, for even if we take the expert testimony at its face value and hold that the top part of this document (Defendant's Exhibit A) was not in the handwriting of Weire, this does not prove that the same and the figures appearing thereon were not *used* by Weire as inducements in connection with the negotiations, which is the really significant effect of the lower Court's finding on this aspect of the case, rather than who wrote the figures in question. Thus the impeachment of Mrs. Karlins, if it was successful in this respect, was on a matter not dispositive of the actual merits of the case. Her testimony to the effect that Mr. Weire *used* this document, whether he wrote on it or not, would be just as effective as if he had written it, especially since Weire did not unequivocally deny having so used it.

Exhibit A is admittedly a document written before the sale, an authentic piece of paper which in fact related to Swank (Guam), and even if written at an earlier time by Williams, could have been, and if Mrs. Karlins' testimony is believed, was used by Weire in persuading

Mrs. Karlins to agree to his proposal. The slight variation of $500 one way or the other from the final figures testified to by Mrs. Karlins is not sufficient to impeach the document. Rather, the closeness of the figures to the terms testified to by Mrs. Karlins is highly persuasive, and with other circumstances justifies the lower Court's finding of authenticity and its acceptance of the real substance of Mrs. Karlins' story that Exhibit A was used by Weire in the final negotiations. For the foregoing reasons and because of the overwhelming showing made by the record in support of the result reached by the lower Court, we hold the lower Court's refusal to permit Mrs. Karlins to be re-examined as to the handwriting on Exhibit A, to be harmless error.

The fact that Mrs. Karlins and Weire were not brought in as additional parties plaintiff and defendant, as sought by the counterclaim of defendant, does not cause the result reached by the lower Court to be erroneous. Plaintiff takes the position that Weire's testimony, and other proffered deposition testimony rejected by the lower Court, prove that, at the time the sale was agreed upon between Weire and Mrs. Karlins, Weire did not have actual authority to bind Regency Manufacturing because he did not then own a majority of Regency Manufacturing's stock and was not the managing director of that corporation; that Weire owned either a one-third or a half of the stock, but more than one-half of all the corporation's stock was at the time pledged with the Belgian Bank. From this plaintiff contends that Regency Manufacturing could not have been and was not bound by any representation Weire may have made, with the implication, apparently, that therefore he could not have made any such representation.

Such facts, even if true, do not, per se, prove that Mr. Weire was without authority at that time to actually bind Regency Manufacturing. The proven fact that Weire manipulated Regency Manufacturing about that time, apparently pretty much as he pleased, makes it not unreasonable to infer, as the lower Court did, that he in fact *had* authority to bind Regency Manufacturing in respect of this contract. Even if he *did not* have such authority, this does not prove that he did not *purport to bind* Regency Manufacturing, as the lower Court held he did. Therefore, proof that he had no such authority does not prove the lower Court wrong in finding that he *did* in effect hold himself out as authorized to forgive the debts or to consider them paid.

■ Finally, even if Weire did not have the authority to bind Regency Manufacturing, and did not therefore, legally bind it when (as found by the lower Court on ample evidence) he made the representations to Mrs. Karlins that the debts were, or would be considered to be paid, including any allegedly owed to Regency Manufacturing, the Regency Manufacturing is *not the plaintiff* in this case, but Regency Creations, one of Mr. Weire's alter-egos, *is,* by virtue of an assignment made by Regency Manufacturing *after* the transaction in question. Since Regency Creations is *now* the owner of the alleged debt, if it existed, then, whether we consider Regency Creations to be an alter-ego of Weire (and therefore Weire himself) or whether we consider Regency Creations as a separate corporation—*in either event*, Weire at the time of the sale transaction had the *power and authority to bind both himself and Regency Creations* through his absolute control of the latter corporation. Hence Regency Creations is bound by any representations he made as an officer and controlling stockholder of Regency Creations, and cannot now be heard to deny being bound by such representations by Weire. The situation is analogous to the situation where A sells by warranty deed land which he does not own and afterwards acquires good title, which then feeds the estoppel against him and prevents him from questioning his warranty. Here, if in fact Regency Creations and/or Weire had no power to bind Regency Manufacturing, but did purport to so bind it, their subsequent acquisition

of the alleged debt fed the estoppel, and binds them now.

In an apparent attempt to get around this theory, plaintiff has cited 20 Am. Jur., Sect. 1099, which seems to eschew estoppel as a device for circumventing the parol evidence rule. However, as pointed out by Wigmore, supra, the estoppel in that case *can be applied without violating* the parol evidence rule for the simple reason that through the fraud of Weire, as, in effect, found by the lower Court, a portion of the entire contract, not inconsistent with the written portion, was *omitted* from the document.

 We come now to the question as to whether the corporate defendant Swank (Guam), which was not an express party to the contract of sale of the stock from Weire to the Karlins, can claim, in this action, any benefit from the contract between Weire and the Karlins, none of whom were made parties to this case. The answer is simple. Under Section 1559 of the Civil Code of Guam,

> "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it."

Here the contract, which included terms under which the corporation Swank (Guam) would no longer owe any money (except the small current obligations) to Weire or any of his alter-egos, was clearly made for the benefit of Swank (Guam), and therefore it is fully enforceable under the Civil Code of Guam, *without making either Weire or the Karlins parties to this action.*

Other contentions of plaintiff, including those of alleged error on the part of the trial Court in refusing to permit plaintiff to recall Mrs. Karlins as an adverse witness to be further examined as to the breakdown of the figures by which the $22,000.00 cash sale figure was reached; as to the alleged use of leading questions by and bias and prejudice of the lower Court, and the exclusion of other evidence proffered by plaintiff, have been fully considered and found to be without merit, or, at most, harmless error. While we think the conduct of the proceedings of the lower Court was arbitrary, intemperate, and erroneous in a number of respects, and while we do not condone such practice, we find that the result reached by the lower Court was the only just and correct one which could have been arrived at on the evidence, including that which was excluded or which might reasonably have been anticipated had plaintiff been allowed to ask all the questions and introduced all the evidence it sought.

Affirmed.